In this term, the justices delivered their opinions separately.
Kirkpatrick, Ch. J.
— Said that he had not altered the opinion which he had formed at the circuit, on the trial of the cause, and therefore, was of opinion, that the rule to set aside the verdict, and order a new trial ought to be refused.
Rossell, J.
— This case seems naturally to divide itself into four general heads: Was the will legally proved ? Had the executors power to sell the lands ? Was the award of the arbitrators admissible evidence before the jury? Was the charge correct ?
Whatever may have been or is now the practice in England,[1] I have no doubt but in Hew Jersey, a copy of a will, regularly proved before a surrogate, is prima facie evidence of its authenticity, subject however, to be controverted by proof of the insanity of the testator, or a want of any of the legal requisites under our acts of the Legislature. Had then, a certified copy of the will in question been submitted to the court legally proved, it would most certainly have been proper to have permitted it to go to the jury. But as the whole proof, which induced the surrogate to admit the [27] will to probate, did, in this, and ought in all cases, to accompany the copy itself, the court, I conceive, are bound to decide on the legality of such proof. For it is a well known practice of surrogates, to grant probate of wills, on proof by no means sufficient to pass real estates, in order that the personal may be properly disposed of, leaving disputes respecting *36 realties to the [*] proper tribunals. It appears, on the face of the instrument in question, that two witnesses were called; the surrogate, as it seems, aware that the evidence of the subscribing witness, Peter Johnston, was not sufficient, admitted Ort Yanpelt, one of the executors, to prove that this will was executed in due form of law. And the question now arises, can an executor be a competent witness to prove a will. It is contended by the counsel for the defendant, that he can; a number of cases have been cited in support of this opinion, and the noted one of Lowe and Joliffe, much relied on. But it must be remembered, that Dovey, the -executor of Joliffe, released a legacy of £200 which he was to receive as a compensation for his services before he was admitted as an evidence; had .Ort Yanpelt released his claim to all compensation for his services as an executor, I think 'he would have stood on equal ground with Dovey. As it does not appear that this was done, under the general principle that he who is interested m or receives a benefit from a will, shall not be permitted to prove it, I am of opinion that Ort Yanpelt was not a credible witness, within the meaning of the law.
Had the executors a power to sell ?
If they had, this must have arisen under the general one of the estate’s being liable to be sold for the payment of debts, or the particular claim empowering them to sell on the account of the marriage of the widow. The first, as there was personal estate nearly sufficient to satisfy all demands, was not much insisted on; on the second point much was said. It is, indeed, a very hard matter to come at the whole intention of the testator, in an instrument so badly drawn as the one under examination; but it appears evident, that he intended his widow, as head of the family, should have possession of the whole estate during her widowhood, for their maintenance; and if she should marry then the estate to be sold, and equally divided between her and *37 liis children, at the disposal of his executors. But I think, the words in which this intention is expressed, do not [*] favor the conclusion drawn by the counsel for the defendant, that his estate was to be sold on the event of her death, as well as of her marriage. The words are, “ If my said wife Catharine, doth marry, that then my whole estate shall be sold, and an equal division made in [28] four parts, &c.” He could not then, whilst thus directing a division of his estate into four parts, have in idea, the death of his widow, or he would most probably, on that event, have divided it into three parts, amongst his three children. Though I do not recollect that this was noticed by the counsel for the plaintiffs on the argument, it strongly inclines me to believe, that he intended the sale only as a consequence of her marriage. As she died before him, the estate was to be equally divided between his children; and this might be done by dividing the land, or selling it, and dividing the proceeds as they might agree.
Was the award admissible before the jury?
I have ever understood, that parties giving bond with a penalty to abide the award of arbitrators, were at liberty to make their election to so abide the determination of the arbitrators, or submit to the penalty of the bond. This principle is laid down in all the books I have had an opportunity of consulting, and is, I believe, universally so understood in Yew Jersey. In the present case, as the possession had gone counter to the award for many years, it must have been understood that the party holding such possession, had made his election, and that the remedy of his opponent was a suit on the bond. If this is correct, the award was irrelative to the point in issue, and as it might have an impi*oper influence on the jury, was inadmissible.
I woidd now, once for all, observe that I consider it as my misfortune, when I differ in opinion from my beloved brethren with ■whom I am associated; and I freely acknowledge ' *38 that whenever this difference takes place, from their superior legal attainments, there are strong reasons to believe my opinion erroneous; yet, as long as I shall have the honor of a seat on this bench, [*] I must have an opinion subject to no control but that of my conscience, and what I conceive to be the laws of my country.
I am, therefore, in the present case, after much consideration, of opinion, that a new trial should be granted, not as prayed for by the counsel for the plaintiffs, without costs, but on the usual terms, the payment of costs.
Pennington, J.
— The state of the case, and the arguments of counsel, bring up the points of controversy, for the consideration and determination of the court:
1st. The admission of the transcript of the will of Isaac Snedeker, to be read in evidence, and its effects as to passing real estate.
2d. The construction of the will, so far as it respects the creation of an authority in the executors to sell the landed estate, in the event that happened.
[29] 3d. The effect of the submission and award of arbitrators, between the father of the lessors of the plaintiff, and Abraham Vantine, under whom the defendants claim title.
. As to the first point, it is in the first place contended, by one of the plaintiff’s counsel, Mr. Leake, that a transcript of a will, devising real estate, cannot be read in evidence in a controversy respecting the devise. This is true, if it is to be considered as a common law mode of proof; but our act of Assembly hath expressly, and in terms authorized it. That position, therefore, is wholly unfounded: even at common law, a probate of a will, in certain cases, is admitted in evidence. Loft, 362. It is, however, contended by the counsel for the plaintiff, that the transcript does not furnish sufficient evidence of the proof of the execution of the will, in conformity to the requisites of the statute for passing real estates. One *39 answer given to this, by the counsel for the defendant is, that the proof of the will need not appear, nor the manner of making the proof; that if it [*] is once on the record'and duly certified, it is sufficient at least to put the adverse party to disprove it. I apprehend that this is giving a construction to the acts that they will not bear. The act of 1713-14, Paterson 5, declares, that all wills and testaments, made and executed in a particular manner, pointed out by the act, and regularly -proved and entered upon the books of record, or registered in the secretary’s office, shall be sufficient to pass real estate; and that the books in which they were registered and recorded, may be given in evidence, &c. I ask, the books in which are registered and recorded what ? The answer is, wills and testaments regularly proved; under this act the court will look into the manner of proof, and see that the solemnities made necessary by the law have been complied with. The 7th section of the act of 7th June, 1799, authorizes the reading in evidence, a transcript of the record of wills, certified by the register of the prerogative office. It is true, that the words of this section go farther than the former act; and declare, such certified transcripts of wills, shall be as good, effectual, and available in law, as if the original wills or testaments, or the books in which they are registered or recorded, were then and there produced and proved. I cannot bring my mind to believe, that the Legislature intended by this section, to prohibit the court from examining into the manner of proof, or that the certificate should be conclusive evidence of the due execution of the will; and that it contains the requisite solemnities to devise real estates. The words of the section are, however, too strong to be rejected. I take it, therefore, that a transcript of a will, certified by the register of the prerogative [30] office may be read in evidence, even without the proofs; but that the fact of its being duly executed to devise real estates, is still open to the jury, and yet to be proved; that a transcript thus circumstanced is not *40 even prima facie evidence of the due execution of a will with the proper requisites to devise real estates. This must be made to appear either by witnesses, in the course of a common law examination, or by indorsements [*] on the will, taken by the surrogate. Should this not be made out by the party producing it, it can avail nothing as a will to pass real estates. It appears to me, a contrary construction would lead to endless fraud and abuse. Another answer given by the counsel for the defendant is, that it doth sufficiently appear that the will hath been duly executed, in the manner required by the statute, to pass real estates; and I incline to that opinion. It is not necessary, that all the subscribing witnesses should be called to prove the will; the practice is to take one of them, and by him to prove that the testator executed the will in the presence of himself and the other two witnesses; and that they all subscribed their names to the same, in the presence of the testator.[1] It is true, that an instrument ought to be proved by the subscribing witnesses, in case they can be had. Rut if not, the next best evidence is to be received. In this case, a by-stander was called; but I think not before the subscribing witnesses were properly accounted for. The will was proved 18 years after the time of its execution; one of the subscribing witnesses was called; he testified to his own hand writing, and that he believed the testator executed the will; but from length of time could not recollect the transaction. And also that the other subscribing witnesses were both dead, as he had heard, and verily believed; a person present at the execution of the will was then called, and he swears to all the requisites to constitute a will for devising real estates. This appears to me a regular transaction, and sufficient prima facie to authorize a jury to find the will duly executed, unless the objection to the competency of the witness, he being an executor named in the will, should prevail. The modern and most approved cases *41 in the English books, on this subject, and one as far back as the time of Lord Chief Justice Hale, prove, that an executor may be a witness to establish a will, unless he take an interest under it.[1] The distinction between a trustee and an executor in trust, hath no solid basis to rest on; that he is liable to devastavit, is no more than every trustee is liable [*] for corrupt or fraudulent [31] acts respecting the trust; that he is entitled to the residue, if a substantial objection, cannot apply in this case, where the residue is disposed of in express terms; nor does the practice in this State, of allowing a reasonable compensation for services performed by an executor,[2] in my view of the subject, alter the case. Is an agent or factor disqualified as a witness, to prove the authority under which he acts, because he is to have a reasonable compensation for his services? I think not. I am, therefore, of opinion, that the chief justice did right, both in transmitting the transcript to be read in evidence; arid also, in instructing the jury, that the will was duly proved to pass real estates.
Under the second head, the counsel for the defendant, on the argument raised two points :
1st. That an authority to the executors to sell the real estate, arose out of the general intent of the testator, apparent on the face of the will, when the different parts are compared with each other.
2d. An implied authority for the like purposes, growing out of the clause in the will, devising the remainder of the real and personal estate, after the debts, funeral charges, and the legacy should be paid.
As to the first point, the general law is, that the intent of the testator is to govern in the construction of wills, when by law it may. I have not been able, however, to discover any intention on the part of the testator, that the land should be sold, in the event that hath happened. After ordering *42 the payment of his debts, funeral charges and a small legacy to his son, for his birth right, he directs that the remainder of his personal and real estate, should be divided in equal parts among his wife and three children, but also provides, that the whole of his estate, both real and personal, should be and remain in the hands of his wife as long as she remains his widow. How could real estate remain in the hands of his wife if it was sold ? Nor can it easily be supposed, that he [*] intended that his wife and children should be turned out of doors; and his wife to keep possession of the money arising from the sale of the estate; and when she married or died, a dividend to be made. It appears to me more reasonable, that he intended she should keep possession of the real estate, for the maintenance and support of herself and children. This opinion is strengthened by an express clause in the will, authorizing, or rather directing a sale of the estate0in case of the marriage of his [32] widow; and in that case a division of the proceeds of sale. If then word then, is not to be considered as denoting the precise time of sale, yet the testator must have contemplated, that the land must have remained unsold at the time of the marriage; or it could not be sold on that event. Nothing, therefore, in my opinion, is to be perceived on the face of the will, denoting an intention in the testator, that his executors should sell the land under the circumstances in which the sale was made, or in any other event than the marriage of his widow. I take no notice of the argument of the counsel for the defendant, relative to supplying words supposed to be omitted by the testator, in order to make out his meaning; for these are only called in, in aid of the plain and manifest intention of the testator. Under the view I have of the subject, the doctrine is wholly inapplicable to the case in question.
The second point under this head, is attended with but little more diffi culty than the first. It is true that a class of equity cases have established as a rule, that a devise of the *43 remainder of the real and personal estate, after payment of debts, funeral expenses, and legacies, or these being first paid, creates a charge on the real estate for the payment of debts, &c. But it does not appear satisfactory to my mind, that the executors in all these cases, have an authority to sell the land. In some cases, the Court of Chancery have directed the heir-at-law to execute a title; and in others have decreed a sale. The farthest that I recollect the doctrine to have been carried on this subject, in a court of common law, is a case in Dyer, 371, where the testator having [*] devised all his estate to a near relation, except a particular piece of land, which he appointed to pay his debts. The executor sold the land to pay debts, and held well. This is the same in substance, as though the testator had directed that this piece of land be sold to pay his debts. In this case, it being the duty of the executor to pay the debts of his testator, it is presumed, that the testator intended that he should sell the land marked out'by him, for the payment of his debts. But I apprehend there is a plain distinction between a. charge on land for the payment of debts and legacies, arising by implication and construction, and a positive direction that the land shall be sold, or what is the same thing, appointed, for that purpose. In the latter, the intention of the testator, that the land shall be sold, is manifest. But the former is at most, nothing more than an indirect collateral incumbrance; a lien arising by construction; a mere charge on the real fund, which the devisee or heir-at-law, ought to have an opportunity of removing. But supposing the adjudications on this subject [33] went further, and declared that whenever by construction or implication, a charge is found to be made on land for the payment of debts or legacies, that the executors have an authority to sell the land to satisfy the charge; that is, to pay the debts or legacies. It is only in cases requiring it, that it is to be done; and not wantonly, and without cause. There ought to be subsisting debts or *44 legacies unsatisfied, after exhausting the personal assets. It is no answer to this, that the purchaser is not to look to the application of the purchase money; he is to look to the authority of the vendor to sell — caveat emptor. There is no authority on the face of the will, to sell. If then, the executor hath an authority to sell, it is bottomed on the simple fact of a deficiency of assets; of subsisting debts or legacies, after exhausting the personal assets. And it appears to me, that the purchaser is bound to look to that as part of his title; otherwise, a door would be open to fraud and collusion, to the ruin of infant heirs and devisees. Let me ask, what are the facts in this case ? The purchaser is no stranger, but the [*] husband of one of the two remaining devisees under the will. The sale is not even pretended to be made for the payment of debts or legacies; the ancestor of the lessors of the plaintiff, was the only legatee. It was absurd to sell his own land, to pay him a small legacy, and thereby ruin him out of kindness. The pretense for the sale Avas, to divide the estate; Avhy not divide the land ? The purchaser put one-half of the purchase money immediately into his own pocket, and thereby turned the real estate of his Avife into personal, by Avhich he increased his oavu interest and diminished the interest of his Avife, or rather changed the title of the land from his wife to himself.. The purchaser and the executors also undertake to settle a question, which might arise as to the disposition of the portion devised to the wife of the testator — whether it was to be considered as a lapsed legacy, and go to the heir-at-laAV, or a cross-remainder, and divided in equal parts among the survivors? It Avas said at the argument, and I believe not contradicted, that one-half of the purchase money being in depreciated paper, Avas tendered to the ancestor of the lessors of the plaintiff, Avhich he refused to receive; if so, the justice of the case is Avholly on the side of the plaintiff. I am, on the Avhole of the facts and circumstances which present themselves under this head, from *45 the best consideration which I have been able to give the subject, of opinion, that the sale by the executors is invalid, and that the deed ought to be deemed ineffectual to pass the title, and put out of the case. Therefore, that the charge given to the jury by [34] my brother, the chief justice, on this head, was wrong.
If, however, the counsel for the defendant are right in the third point which was raised by them, to wit, the conclusiveness of the submission and award of the arbitrators, still, a new trial ought not to be directed. Rot having seen the submission and award, it is difficult to form a precise opinion on its effect and operation in the case under consideration; from what was understood at the argument, the submission was general, embracing all matters in difference between the parties : that the [*] arbitrators awarded the land in question to Yantine, under whom the defendant claims title; but that the father of the lessors of the plaintiff, and the lessors themselves, kept possession of the premises until two or three years back, notwithstanding the sale by the executors, and the submission and award by the arbitrators; but that law suits had subsisted between the parties part of the time. All the authorities, as well ancient as modern, prove in the most unequivocal language, that an award cannot operate as a conveyance of land. This principle is not only supported by the plainest principles of the common law, but conclusively established by the statute for the prevention of frauds and perjuries. This point hath been argued with great learning and ingenuity by the counsel on both sides; and is, therefore, from that circumstance, if no other, entitled to some consideration. One of the counsel for the defendant, assimilated arbitrators to a court — and then urged the general doctrine as to the conclusive nature of the judgments, decrees, or sentences of a court, having competent jurisdiction of the subject matter. I confess that I do not perceive the analogy; however, if he was ever so correct, yet, I apprehend, there *46 was a want of jurisdiction. Arbitrators may award, if the submission authorizes it, that one party shall execute conveyances to the other.[1] But this does not pass a title; and if the party refuses to convey, the remedy is on the bond. But in case the arbitrators should award the land, it would be an act exceeding their jurisdiction, and void of itself for that cause. 2 Bacon, 202; 1 Ld. Raym. 115. It, therefore, could not be the decree or judgment of a court having competent jurisdiction; besides, a void judgment is no judgment. If, in this case, the arbitrators awarded the land, the award is void. If they awarded, that the father of the lessors of the plaintiff, should convey by deed or in any other way, the remedy is on the arbitration bond, or agreement td submit; but doth not vest a title in the [35] defendant or Vantine, under whom he claims. It is however, further contended by the counsel for the defendant, that the lessors [*] of the plaintiff can not recover the land against their ancestor’s covenant or agreement to abide the award of arbitrators. In support of this proposition, was cited Right v. Proctor, 4 Bur. 2208. In looking into this case, I find that it is not a case of arbitration, and that both Lord Mansfield and Mr. Justice Yates, who are the only judges who gave a reason for their opinion, treat the covenant under which the defense was set up, as a lease. The instrument itself supports the idea, as it contains a covenant, that on the death of the lessor of the plaintiff, his representative shall renew the lease. That a man shall not recover in ejectment against his own lease, is no new doctrine. On this head, the case of Den, on the demise of Reeves v. Hyllier, tried before me at the Burlington Circuit, November, 1804, was cited. The case was this: a prior ejectment had been brought by the father of the lessors of the plaintiff, against the defendant, for the premises in question. This was submitted to referees, by rule of court. The referees reported in favor of the plaintiff, *47 and fixed the line, it being a case of boundary. On the coming in of the report, the defendant moved to set it aside. This motion was lost, and judgment obtained in this court. The cause was carried up to the Court of Appeals, and there the judgment of this court was affirmed. The defendant refused to give up the premises, for the recovery of which, the action was brought. The plaintiff offered the record of this judgment in evidencie. This was objected to by the counsel for the defendant, and after argument I admitted it to be read; and I have since understood, that the chief justicie did the same in a former trial of the same cause. But this ease in no way resembles the one under consideration ; here was an actual adjudication on the very point in controversy, by a court having competent jurisdiction of the subject matter, affirmed by the highest tribunal in the State. It was certainly competent evidence, and that was all that was decided.
Under this head, the court is reminded, that this is an equitable action; and that the court will not aid the [*] plaintiff against the justice and equity of the case. I am not convinced that the justice and equity of the case is with the defendant; but if it is, and the principles of the common law will not protect him, he must seek relief from a court of equity. I apprehend, that a mistaken notion is gaining ground respecting the equitable qualities of an ejectment. The legal fictions giving form to the action of ejectment, are under the equitable control of the court, and moulded by it [36] in such manner as to bring the question of title fairly before the court and jury, stripped of the entangling niceties of ancient pleadings; and to avoid the endless delays attending them. So far as these fictions have any operation, they are under the equitable power of the court, whose duty it is to prevent their doing an evil, and to cause them to do good; hence the idea of an equitable power in the courts of law, peculiar to the action of ejectment. But I never understood that legal titles were to bend to the equitable interposition of *48 the court in the action of ejectment, more than any other action, wherein the title to real estate is tried. It is true, that courts of law, have, in some cases, taken notice of trusts; they will not permit a stranger and wrongdoer, to defend himself by setting up a mere trust estate, standing out in the hands of the trustee of the lessor of the plaintiff. In this court, we would not suffer a satisfied mortgage to be set up by a stranger against the mortgagor. But these are plain, unequivocal cases, involving not a shadow of right; they do not grow out of the equitable notion of the action of ejectment, but arise from the liberal policy and sound exercise of discretion in courts of common law, that will not suffer the pure streams of justice to be dammed up, or even impeded by mere forms and shadows.
On the whole, I am of opinion, that a new trial ought to be directed.
By the Court. — Let the verdict be set aside, and a new trial had.
[*] [The reporter is informed, by one of the counsel in the cause, that this cause was noticed for trial again, at the last Middlesex circuit, in December, 1806; and being called on in its course, the chief justice, who held that circuit, was challenged by the defendant, as incompetent to sit in judgment on the trial of the cause; for that he had formed and delivered a.n opinion, upon a matter in question, in said cause; that the plaintiff demurred to this challenge ; and after argument, the chief justice decided that he was rendered incompetent,to sit on the trial of the cause, by the supplement to an act entitled an act the better to promote the impartial administration of justice, and that the cause went off on that ground. This supplement was passed the 6th of March, 1806,[1] the first section of which enacts as follows: That no judge of any court of record in this State, who shall have formed and delivered his opinion, upon any matter in question, in any cause or controversy depending in such court, shall sit in judgment, upon the trial or argument of such cause, or any point in controversy thereon, whether such judge, at the time of delivering such opinion, was attorney on record, or counsel for either of the parties in such cause or not; provided always, any matter or thing herein contained, shall not be construed to prevent any judge from sitting on the trial of such cause, merely because he may have given his opinion in any other cause, where the same matter in controversy shall have come in question.
The reporter thinks that he may, without incurring the [37] charge of traveling out of the duty assigned him, as reporter, hazard an opinion, that there must have been some mistake in wording the before recited section, as it cannot hardly be supposed that the Legislature intended, that in cases where a judge had delivered an opinion on one trial, or on a motion *49 for a new trial, that he should thereby become incompetent to sit in judgment on the second trial of the cause, as this would prevent a new trial in any case. In the present case, the doors of justice are at once closed, for not only the chief justice, but the two associate justices have both formed and delivered [*] opinions upon matters, in question in the cause, as appears by the foregoing report.][1]
Cited in Den, Snedekers v. Allen, 1 Penn. 34; Den v. Van Cleve, 2 South. 689, 652; Den, Johnson v. Morris, 3 Halst. 213; Den, Compton V. Mitton, 7 Halst. 70; Den, Mickle v. Mallack, 2 Harr. 86; Allaire v. Allaire, 8 Vr. 319.

 Vide 3 Johnson's Cases, 234, Jackson v. Rumsey. — Ed,

 1 Saun. Pl. and Ev., 932. — Ed.

 Ib. 934- — Ed,

 Vide Voorhees v. Stoothoff, 6 Halst. 149

 Vide 1 South. 132. — Ed.

 Vide post, *195, Den v. Hopkins

 Repealed by act of 24th of February, 1820. Rev. 689.